**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**TANYA JACKSON-SMITH**,

        Plaintiff,

vs.

        Hon.
        Case No.: 23-

**HARTFORD LIFE AND ACCIDENT**
**INSURANCE COMPANY**,
a Connecticut company,

        Defendant.

_____/

## <u>COMPLAINT</u>

Plaintiff, TANYA JACKSON-SMITH, through her attorneys, ILANA S. WILENKIN and FELDHEIM & WILENKIN, P.C., complains against the above-named Defendant as follows:

### I.      Jurisdiction and Venue

1)    This Court's jurisdiction exists under the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§ 1132(e)(1) and 1132(f), which provisions grant this Court the jurisdiction to hear civil actions to recover benefits due under the terms of an employee welfare benefit plan.

2)      Defendant, Hartford Life and Accident Insurance Company ("The Hartford"), issued to Greektown Casino, LLC ("Greektown") the subject Long-Term Disability Plan ("the Plan/Policy").   The Hartford underwrites the coverage and acts as the claims' administrator.

3)      The Plan is sponsored and administered by Greektown, Plaintiff's ("Ms. Jackson-Smith") former employer, for the benefit of its employees, including Ms. Jackson-Smith.

4)      29 U.S.C. § 1133 provides a mechanism for the administrative or internal appeal of benefit denials.   Ms. Jackson-Smith has either exhausted all of her appeals or has been denied access to a meaningful and/or full and fair pre-suit appellate review.   This matter is ripe for juridical review.

5)      Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, venue is proper in the Eastern District of Michigan.

## II.      Nature of Action

6)      This is a claim seeking disability income benefits and, if applicable, a total disability waiver of life insurance premium.  The claim(s) is being brought pursuant to § 502(a)(1)(B) of ERISA - 29 U.S.C. § 1132(a)(1)(B).

### III.     The Parties

7)      Ms. Jackson-Smith is 57-years-of-age.  She was, and continues to remain, a resident of Farmington Hills, Michigan.

8)      The Plan is an employee welfare benefit plan sponsored and administered by Greektown for the benefit of its employees, including Ms. Jackson-Smith.

9)      The Hartford underwrites the Plan and administers claims.  It is a Connecticut corporation conducting insurance-related business in the State of Michigan, including the Eastern District.  The Hartford's resident agent for service of process is: The Corporation Company, 40600 Ann Arbor Rd., E., Suite 201, Plymouth, MI 48170-4675.

10)      During all relevant times, the Plan constituted an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), and, incidental to her employment with Greektown, Ms. Jackson-Smith received coverage under the Plan as a "participant," as defined by 29 U.S.C. § 1002(7).  This claim relates to benefits due under the above-described Plan.

### IV.     Factual Statement/Allegations

11)      Ms. Jackson-Smith began working for Greektown on 12/8/00 as a Slot Technician.

12)     Ms. Jackson-Smith received various benefits pursuant to her Greektown employment, including long-term disability insurance and, upon information and belief, life insurance coverage with a total disability waiver of premium.

13)     Mrs. Jackson-Smith stopped working in any capacity on 8/7/20 due to the following medical conditions:

- Fibromuscular dysplasia;

- nontraumatic intracerebral hemorrhage, intraventricular;

- atrial fibrillation;

- vertebral artery aneurysm and dissection, subsequent pseudoaneurysm s/p coiling (04/2011 and 03/2013);

- Sjogren's disease;

- chronic pulmonary disease, including asthma;

- essential hypertension;

- chronic migraines; and

- upper and lower extremity weakness and instability.

**A.     Claim History & Administrative Appeal**

14)     Subsequent to her last day of work, Mrs. Jackson-Smith applied to The Hartford to begin receiving STD and LTD benefits, which

claims The Hartford approved and paid beginning approximately 8/16/20 through 2/5/23.

15) On or about 6/27/22, Nicole Hall (MCM) indicated the following regarding Ms. Jackson-Smith's health conditions, as noted by the Mayo Clinic:

> 4/22/2022 12:00:00 AM
> No response received back from Dr. Grysiewicz.
> Mayo Clinic Fibromuscular dysplasia notes:
> Fibromuscular dysplasia is a condition that causes narrowing (stenosis) and enlargement (aneurysm) of the medium-sized arteries in your body.  Fibromuscular dysplasia appears most commonly in  the arteries leading to the kidneys and brain. **Treatments are available, but _there_ _isn't a cure for fibromuscular dysplasia_**.  Although max function unclear, MCM would agree that the medical information does support that claimant would be precluded from consistent and reliable heavy tasking required for her own occupation including any heavy lifting, carrying, pushing and pulling, prolonged standing and prolonged walking **_as it is noted she has slow gait with intermittent drag of the right leg, using a cane and there is mild grip weakness, 4+/5. Right knee flexors -4/5.  With the diagnosis of fibromuscular dysplasia, she is at risk for artery dissection, stroke, high blood pressure and aneurysms._**

(Ex. 4 of 7/5/23 Administrative Appeal). (emphasis added).

16) As part of its any-occupation review, The Hartford scheduled Ms. Jackson-Smith for a 1/24/23 neurologic IME with Dr. Anthony Emmer.

17)   On or about 1/23/23, Mrs. Jackson-Smith advised The Hartford's MCM/IME vendor that she was unable to attend the 1/24/23 IME because an aneurysm had been discovered under her left arm and surgery was likely going to be scheduled:

> MCM reached out to claimant as per vendor email, they received a call from the claimant stating that she cannot attend the schedule exam on 1/24 at 10:45am
> due to her finding out from her doctor that she has an aneurysm in her arm and she is having surgeon done.
>
> MCM reached out to AA and AA was not aware of any new surgeries. After discussion with claimant, whom noted she saw cardiology and has more testing coming up and she has an appointment on 2/6/23 with vascular surgery regarding a new aneurysm found under her left arm. **MCM advised AA of this and _cancelled_ IME**.

(Ex. 1 of 7/5/23 Administrative Appeal). (emphasis added).

18)   A 1/23/23 Hartford internal note indicated:

> 1/23/23 update:
> EE did not attend IME. Per MCM:
> "Her IME was scheduled for 1/24/23 but she noted she can't attend due to having additional surgery done. Test change is 2/6/23. The vendor is asking if it's ok to re-schedule or if this should just be cancelled.'"

(Ex. 2 of 7/5/23 Administrative Appeal).

19)     On 1/26/23, Nicole Hall (MCM) responded to the preceding

1/23/23 question as follows:

> From: Hall, Nikki (Core Claims)
> <Nicole.Hall@thehartford.com>
> Sent: Wednesday, **January 25, 2023** 5:43 PM
> To: GB Claims IME Vendor Coordinator (Claims Solutions
> and Analytics)
> <GBClaimsIMEVendorCoordinator@thehartford.com>
> Subject: RE: Smith| 27751877| IME Reschedule
> Approval Follow Up
>
> Good afternoon,
> **You can cancel and close out the referral**.
>
> NICOLE HALL, RN CCM
> Medical Case Manager

(Ex. 3 of 7/5/23 Administrative Appeal). (emphasis added).

20)     The Hartford denied Ms. Jackson-Smith's claim for ongoing

any-occupation LTD benefits effective 2/6/23 because:

> You canceled the Independent Medical Examination as
> you indicated there was a change in your function.
> Medical has not been received to clarify your function
> and you did not go to the Independent Medical
> Examination so at this time we have insufficient medical
> to clarify whether you meet the definition of disability.
> Therefore your claim is terminated effective 2/6/2023.

(Claim File).

21)     On 2/20/23, 12:18 p.m., The Hartford and Ms. Jackson-Smith

exchanged emails regarding her claim denial due to the IME that she

allegedly "skipped":

> **Email from Ms. Jackson-Smith:**
> This is some unfair treatment. First, of all I never received a letter from you. I spoke with someone from your office and they told me a letter was mailed out to me. I told them I never received it. Then they asked me what was my address. They sent the letter to a address I [haven't] lived at in almost 4 years. So now I'm being punished for being unable to work as well as yall sent the letter to the wrong address. I GUESS THATS MY FAULT TOO. I WILL DEFINITELY BE FIGHTING BACK FOR THIS UNFAIR TREATMENT. IVE BEEN VERY SICK.
>
> I ALSO HAVE PROOF OF SOMEONE REACHING OUT TO ME AND I TOLD THEM HOW SICK I WAS. I ALSO HAVE PROOF OF ME AT THE DOCTOR'S OFFICE, SICK AND FINDING OUT I HAVE CORONARY HEART DISEASE ON TOP OF ANOTHER BLOOD CLOT IN MY LEFT ARM. I ALSO WAS IN THE HOSPITAL FOR A FEW DAYS. MY CASE SHOULDN'T BE CLOSED. I CAN'T HELP THE FACT I WAS SICK AND COULDN'T MAKE THE APPOINTMENT I KNEW NOTHING ABOUT. I KNOW YOU GUYS RECORD ALL CALLS. AGAIN I HAVE ALL MY DOCUMENTATION OF THOSE DATES. PLEASE CONTACT ME AT YOUR EARLIEST CONVENIENCE. FOR THIS UNFAIR TREATMENT
>
> **Email from The Hartford to Ms. Jackson-Smith:**
> This is a follow up email to the one sent to you on 02/17/2023, and a response to the voicemail left on 02/20/2023.

The Hartford has terminated your claim for disability benefits effective 02/06/2023, on the basis that you failed to attend an Independent Medical Exam set up by us. As the medical information received from your current treatment providers did not provide clear functional information, we scheduled you for an Independent Medical Examination (IME) to obtain your current functional abilities and restrictions so that we could review your claim for your ability to perform Any Occupation. In our letter dated 12/27/2022, you were notified that an IME was scheduled for 01/24/2023. However, you did not attend this examination and on 01/19/2023 you advised that with all these tests and new things that came up, you just can't do another evaluation appointment that was scheduled by The Hartford. You also indicated that you would not be attending the IME as you would be having surgery. We also notified you that failure to attend this evaluation would result in termination of your benefits. On 01/24/2023 we received information indicating that you did not attend the IME on 01/24/2023.

You will receive a letter in the mail that goes into more detail, provides policy language and provisions, and your appeal rights. At this time, you would need to appeal the termination decision.

When you receive the termination letter, you will need to look near the bottom of the letter, there you will find how to appeal.  Once your appeal is received, your claim will be assigned to an Appeals Specialist, and they will review your claim as a whole.

(Claim File).

9

22)     On or about 2/21/23, Ryan Purdy (Hartford claim analyst) noted: "Email from EE - EE changing her story on why she didnt [sic] attend IME - No action - EE adv to appeal." (Ex. 5 of 7/5/23). (emphasis added).

23)     Upon information and belief, Ms. Jackson-Smith's claim file did not contain an email in which she "changed her story."

24)     At the time The Hartford denied Ms. Jackson-Smith's claim, it was aware that Ms. Jackson-Smith had timely notified it or its IME vendor that she would not be able to attend because an aneurysm had been detected and surgery was likely required.  Ms. Jackson-Smith also informed The Hartford that she was additionally unable to attend the IME because she was hospitalized at Beaumont Health (now Corewell Health) beginning 1/24/23 through 1/25/23.

25)     Ms. Jackson-Smith appealed The Hartford's denial on 7/5/23 and provided evidence supporting total and permanent disability under the Plan/Policy.

### A.     Historical & Current Medical Evidence

26)     Ms. Jackson-Smith underwent a total abdominal hysterectomy, bilateral salpingectomy, left oophorectomy on or about 1/10/20. (Ex. 6 of 7/5/23 Administrative Appeal).

10

27) On 2/2/20, Ms. Jackson-Smith presented to Royal Oak Beaumont's Emergency Department with heavy vaginal bleeding, post 1/10/20 total abdominal hysterectomy with a left nephrectomy. She was hospitalized through 2/6/20. (Ex. 6 of 7/5/23 Administrative Appeal).

28) On 7/1/20, Ms. Jackson-Smith presented to Royal Oak Beaumont for a cardiology exam:

> Normal sinus rhythm
> Voltage criteria for left ventricular hypertrophy
> Nonspecific T wave abnormality
> Abnormal ECG
> When compared with ECG of 11-JAN-2020 16:23,
> T wave inversion less evident in Anterolateral leads

(Ex. 6 of 7/5/23 Administrative Appeal).

29) On 7/15/20, Ms. Jackson-Smith presented to Royal Oak Beaumont's Emergency Department complaining of right arm numbness and shaking for approximately one week:

> The patient is a 53 y.o. who presents to the ED for intermittent R Upper extremity numbness prompted by lying on her R side and relieved by shaking her arm.
> EMR and nursing notes reviewed.
> VS are stable.
> Physical exam remarkable for nonfocal neuro exam.
> Normal gait in the ED.
> Stroke/TIA workup ordered due to history of vertebral artery dissection.
> Labs and imaging do not note any abnormalities.

11

> On re-evaluation, the patient is resting comfortably in bed, no change in her neuro exam. Discussed the case with the on call Neurosurgery provider. Currently do not suspect the Pt is having TIA vs stroke at this time, episodes are more representative of compressive neuropathy.
>
> The patient was discharged home with instructions to follow up with their primary care physician and neurologist. in 2- 3 days. Also discussed with patient that they can return to the emergency department if they have any worsening of symptoms.

(Ex. 6 of 7/5/23 Administrative Appeal).

30) On 8/8/20, Ms. Jackson-Smith presented to Royal Oak's Beaumont's Emergency Department with stroke complaints. She was admitted from 8/8/20 through 8/15/20 as follows:

> Patient is a 54 yo female vertebral artery dissection w/ subsequent pseudoaneurysm (coiled 2011, 2013), HTN, fibromuscular dysplasia, Sjogren's syndrome, migraine disorder, as well as below.
>
> Presents w/ nausea, vomiting, and dizziness that began this morning. Pt went to bed last night feeling in her usual state of health and woke up this morning at 8 am feeling at baseline. By around 10 am she became acutely nauseous, dizzy, and has had repeated episodes of vomiting since that time. She reports feeling 'weak all over' and states that she 'can't move,' however she has nothing focal on exam. NIHSS below. . . .
>
> **Assessment and Plan:**
> - HGT w/ intraventricular hemorrhage

- Discussed w/ neurosurgery who will evaluate the patient
- Further orders and management per neurosurgery
- Patient to be admitted to SICU
- No acute intervention from acute stroke team perspective

8/11/20 cerebral angiogram, negative

**Hospital Course:**
This is a 54y.o. female on daily ASA with PMH of HTN, migraine headaches, fibromuscular dysplasia, TIAs and left vertebral artery pseudoaneurysm s/p coiling 04/2011 who presented EC on 8/8/2020 with c/o acute onset dizziness and nausea. Her SBP was 180 in the EC & she was in new onset afib. HCT showed a small amount of intraventricular hemorrhage in the 4th ventricle. She was admitted to the SICU. She converted back to NSR without intervention. Cardiology was consulted. On 8/11/2020 she underwent a cerebral angiogram which did not identify the source of hemorrhage. She remained inpatient due to cephalgia and  dizziness with movement. She was seen by PT and OT who recommended home with supervision and homecare PT. On 8/15/2020 she was tolerating diet, ambulating with mild dizziness, voiding and her pain was controlled with oral regimen. She was deemed medically stable for discharge to home. She was given scrip for a repeat HCT on 8/25/2020 and f/u appt script with Northpointe cardiology. Patient was agreeable.

(Ex. 6 of 7/5/23 Administrative Appeal).

31)    On 8/9/20, Ms. Jackson-Smith treated with Northpointe Heart

Center for new onset of A-fib:

13

> Patient is a 54 year old female with a PMH of HTN, migraines, fibromuscular dysplasia, TIAs, left vertebral artery pseudoaneurysm s/p coiling 4/2011 Who presented to the EC for dizziness and nausea. The patient woke up feeling like this and had an episode of nausea as well. Upon arrival to the EC, she was found to have a SBP of 180 and be in new onset atrial fibrillation. HCT revealed a small amount of IVH in the 4th ventricle. Cardioloav consulted for atrial fibrillation.
>
> **Active Hospital Problems**
> Diagnosis
> • Intraventricular hemorrhage

(Ex. 7 of 7/5/23 Administrative Appeal).

32) On 5/16/22, Ms. Jackson-Smith treated with Dr. Pottmeyer (pulmonology) for Sjogren's syndrome with other organ involvement, cough and shortness of breath, abnormal CT scan, lung, secondhand smoke exposure, and impaired gas exchange:

> Patient seen in clinic today for episodes of coughing and occasional shortness of breath during the day.  States coughing episodes at night will happen a few times a month. Wakes up suddenly in the middle of the night with dry hacking cough which lasts approximately 30 to 45 minutes. Eventually does resolve without intervention. Patient has albuterol inhaler but has not been using it. Patient also endorsing some panic attack episodes during the day with associated shortness of breath. These episodes generally last 15 to 20 minutes and again resolve without specific intervention. Sometimes will continue to feel somewhat short of

14

breath following the episodes for a few minutes. Daytime episodes more frequent than nighttime episodes and occur a few times per week. Also not using her albuterol inhaler for these interventions. She is not on any chronic inhalers has was taken off of these at her last visit. Recently, her PCP has represcribed Advair with the patient has yet to pick this up. Patient has concerns that her Sjogren's syndrome may be contributing to her symptoms above. States these are not dissimilar from how the symptoms started when she was hospitalized a couple of years ago for her stroke and intra-abdominal issues. She still has not seen a rheumatologist and has not been on any steroids as an outpatient. Generally speaking, her Sjogren's symptoms appear as dry eyes, dry mouth, and arthralgias . . .

Patient has complex past medical history, but overall her respiratory symptoms do not sound malicious at this time. She does notably have mildly decreased diffusing capacity on her prior PFTs. Could be a component of pulmonary hypertension from some interstitial involvement of her Sjogren's, although suspect relatively mild.  Asthma also consideration as etiology for nocturnal cough; she has not had bronchodilator testing or methacholine challenge.

**Recommendations:**
– Repeat pulmonary function testing with spirometry pre and postbronchodilator and DLCO.

– If DLCO significantly decreased, would obtain lung volumes and repeat CT scan of the chest with high-resolution CT to further assess for Sjogren's with lung involvement. Would also have echocardiogram performed at that time for estimation of RVSP.

15

–   Recommended patient to follow-up with rheumatology as has been recommended in the past.

–   Hold on empiric treatment with preventative inhalers for now as these may increase likelihood of false negative on pulmonary function testing with regards to assessment for asthma.

–   Instructed patient on utilization of as needed albuterol for nocturnal cough symptoms.

–   Daytime symptoms less likely to be helped by albuterol as these sound more likely related to anxiety.

–   Follow-up in pulmonary fellows' clinic in 3 months after testing completed.

(Ex. 8 of 7/5/23 Administrative Appeal).

33)   On 8/2/22, Ms. Jackson-Smith presented to Royal Oak Beaumont's Emergency Department complaining of neck and arm pain:

> 56-year-old female past medical history of brain aneurysm x2 s/p surgical repair, carotid stents, and CVA who presents to the ED for evaluation of neck and arm pain. Patient states that at 7 AM, she woke up and had sudden onset left neck, left shoulder, left upper back, left upper chest, and left arm pain.  She is unable to describe the pain but just states it is a sharp pain. Is unable to describe if it originates anywhere. States that it is diffusely all over without any shooting pains. Denies any numbness or weakness that is new. States that she does not have any chest pain or shortness of

16

breath. Denies any other complaints at this time. Has not tried anything at home for pain control . . .

Neck:
Comments: **Limited range of motion with severe flexion to left**.

Musculoskeletal:
Comments: **Subjective and distractible pain along the left paraspinal muscles, left shoulder, left upper extremity, and left upper back/scapula. Neurovascularly intact distally. FROM of the LUE active and passively.**

*IMPRESSION:*
*Enlarged mediastinum may be exaggerated by imaging technique would be better assessed with a PA chest x-ray.*

*No acute consolidation, pleural effusion, or pneumothorax evident. Suspect strandy atelectasis left lung base.*

*CT HEAD W/O IV CONTRAST*
*IMPRESSION:*
*1.  No acute intracranial abnormality.*

*CT CERVICAL SPINE W/0 IV CONTRAST*
*IMPRESSION:*
*1.     No acute osseous abnormality.  There is likely mild to moderate foramina narrowing at C6-7. No high-grade spinal canal narrowing.*

Pt presents to the ED for evaluation of neck and arm pain. PEx per above, VSS. Lab work and imaging including a CT of the head and C-spine are unremarkable other than mild to moderate foraminal narrowing at

17

C6/7. Patient was given Tylenol, Robaxin, lidocaine patch for pain and her dose of lisinopril for her blood pressure. She was reassessed afterwards and had improvement in her symptoms. Blood pressure improved as well. Do not feel the patient at this time has any concerning signs for dissection. Discussed with her that due to her history of having a carotid dissection, she must return if she develops any symptoms such as syncope, lightheadedness, worsening numbness or weakness in the extremity, or other complaints. She was advised to follow-up with her neurologist which she has an appointment with tomorrow for an MRI to rule out any other causes of her cervical radiculopathy. Patient/family understands the disposition and plan at this time. Warning signs to return for were discussed. Follow-up information was provided. All questions and concerns were answered and addressed. Patient is stable at this time for disposition.

(Ex. 6 of 7/5/23 Administrative Appeal).

34) On 8/4/22, Ms. Jackson-Smith presented to Royal Oak Beaumont for labs. (Ex. 6 of 7/5/23 Administrative Appeal).

35) On 9/20/22, Ms. Jackson-Smith treated with Dr. Pottmeyer to follow up on asthma and cough:

Patient presents to clinic today for continued follow up on cough. States her daytime symptoms are nearly resolved, but she is still waking up about 3 nights per week with cough. No clear triggers. She has been seen in the emergency department twice in the past month for unrelated issues (UTI and neck pain). She is using albuterol with some relief but has run out and is requesting a refill. No wheezing, sputum production, or

18

dyspnea on exertion. She is on lisinopril for hypertension which is thought to have been a contributing factor for her prior intraventricular hemorrhage. Blood pressure medications are managed by her neurologist, Dr. Grysiewicz. Still has not seen rheumatology for Sjogren's syndrome; requesting referral today . . .

**Assessment and Plan**
#Chronic cough
#Mildly decreased diffusing capacity
#Suspected generalized anxiety disorder
#Sjogren's syndrome with unspecified organ involvement
#History of vertebral artery dissection complicated by CVA
#Cerebral artery aneurysm with hemorrhage status post coiling
#Uterine fibroids status post hysterectomy
#Fibromuscular dysplasia
#Secondhand smoke exposure

Differential for cough includes drug side effect (on ACE), cough variant asthma, or Sjogren's related lung disease. PFTs since last visit are largely normal with the exception of persistent mildly reduced diffusing capacity. This does not rule out lung involvement of Sjogren's or asthma, but does put them lower on the differential.

**Recommendations:**
-        continue albuterol inhaler as needed

-        Given serious complications associated with the patient's blood pressure in the  past (intraventricular hemorrhage), after the patient's visit today I discussed the possibility of transitioning the patient off of her ACE with her

19

neurologist who currently manages her hypertension medications. Patient has apparently been trialed on several other classes of blood pressure medication in the past.  Current plan is to transition to ARB to see if coming off of ACE resolves her cough.  Appreciate their assistance. Patient was updated.  She was instructed to stay on her ACE until a new medication is prescribed.

- check echo to rule out pulmonary vasculitis related to Sjogren's as cause for decreased DLCO (no other clear explanation for this at this time). Prior echo in 2020 was WNL, DLCO was decreased at that time as well.

- Rheumatology referral provided

- Follow-up in pulmonary fellows' clinic in 3 months.

(Ex. 8 of 7/5/23 Administrative Appeal).

36)    A 10/27/22 transthoracic echocardiogram demonstrated:

SUMMARY
The left ventricular ejection fraction is estimated at 60%.
Wall thickness is mildly increased.
There is mild to moderate tricuspid regurgitation.
There is no pericardial effusion.

(Ex. 6 of Administrative Appeal).

37)    On 12/14/22, Ms. Jackson-Smith treated with Dr. Pottmeyer to follow up on a cough.  Dr. Pottmeyer's diagnoses included:

**Impaired gas exchange (primary)**
Abnormal CT of the chest [R93.89]

20

Sjogren syndrome, unspecified (CMS/HCC) [M35.00]
ACE inhibitor intolerance [Z78.9]

Patient states cough much improved since switching lisinopril to losartan. Still occasional nighttime cough, but no longer have nocturnal awakenings. Cannot remember last time she needed albuterol. No shortness of breath or wheeze. She has seen a rheumatologist since her last visit in clinic and has been diagnosed with fibromyalgia and started on amitriptyline. No current treatment for her sjogrens was recommended. Referral to cardiology made for mild RA and RV enlargement. Patient still using breo without evidence of thrush . . .

Cough nearly resolved since coming off of ACE. Residual cough likely secondary to some element of airway hyperreactivity. Will further investigate prior findings of bibasilar interstitial opacities.

**Recommendations:**
-      recommend lifelong discontinuation of ACE inhibitors due to cough; tolerating ARB at this time.

-      continue albuterol inhaler as needed, has not used in months.

-      will trial coming off of breo.

-      mild RA and RV enlargement on recent echo. In setting of decreased DLCO, sjogrens syndrome, and prior subtle bibasilar interstitial opacities, will get HRCT to more definitively assess for autoimmune related ILD. If prior changes due to atelectasis, should expect they would be resolved

21

at this time (and certainly should not be present on prone imaging).

- following with rheumatology for sjogrens, no specific treatment at this time.

- appointment with cardiology pending for echo findings of RA and RV enlargement.

Follow-up in pulmonary fellows' clinic in 3-6 months.

(Ex. 8 of 7/5/23 Administrative Appeal).

38) A 1/17/23 left forearm ultrasound demonstrated:

Impression:
1. The palpable lump in the antecubital fossa correlates with a partially thrombosed venous aneurysm/pseudoaneurysm. Recommend correlation with prior trauma and follow-up as clinically indicated.

2. Palpable lump along the anterior distal forearm correlates with a 1.3 cm lipoma.

(Ex. 6 of 7/5/23 Administrative Appeal).

39) On 1/23/23, Ms. Jackson-Smith treated with Dr. Cami for chest

pain:

**Problem List:**
Paroxysmal atrial fibrillation
Hypertension
TIAs/CVA brain bleeding
S/p Left carotid stent.

Left vertebral artery pseudoaneurysm s/p coiling 4/2011

**History:**
She has been having chest discomfort over the past week. The chest pain occurs typically every day. It can happen with rest or activity. She has tried Pepto-Bismol which has not improved the chest pain. Denies any shortness of breath or palpitations. On a recent transthoracic echo she was also found to have an enlarged right ventricle. Recently she was also diagnosed with fibromyalgia and started on amitriptyline.

**Past History:**
Fibromuscular dysplasia, cerebral hemorrhage and aneurysm s/p stenting and coiling.

**Impression and Plan:**
1. **Enlarged right ventricle**. Will obtain cardiac MRI to further evaluate the size and function of the right ventricle as well as rule out a cardiac shunt. Patient has had claustrophobia with other MRIs. Prescription for Valium for 2 tablets was given to take 1 hour prior to the exam.

2. **Chest pain**. We will obtain a coronary CTA to evaluate for coronary artery disease. She is at elevated risk given her history of arterial aneurysms and dissections.

3. **Preventative**. LDL level is mildly elevated above goal. Will readdress after coronary CT has been obtained.

4. **Hypertension**. Blood pressure mildly elevated today. Continue home blood pressure checks and continue losartan.

(Ex. 7 of 7/5/23 Administrative Appeal).

40)     On 1/24/23 (date of Dr. Emmer's IME, which Hartford/vendor cancelled), Ms. Jackson-Smith presented to Beaumont Urgent Care, West Bloomfield complaining of dizziness:

> Tanya Marie Jackson Smith is a 56y.o. female patient with history of brain tumor, brain aneurysm, and stroke presents to the clinic for dizziness for 3 days. Pt admits to chest tightness, epigastric pain, and HA. She states her symptoms got worse today. Pt denies syncope, SOB, numbness, tingling, facial weakness, slurred speech, tachycardia, fatigue, weakness, acid reflux, N/V/D, fever, chills, or cold symptoms. Pt states she drinks coffee daily. She denies taking illicit drugs.
>
> Physical exam showed epigastric tenderness. Unsteadiness noted with heel to toe exam.  The rest of the exam is normal including cranial exam.  EKG showed normal sinus rhythm, and left ventricular hypertrophy. COVID PCR is negative.
>
> Due to pt's symptoms and clinical findings and her history of stroke, brain aneurysm, and brain tumor I advised her to go to ER for further evaluation and management. Pt agreed. Called 911. **Pt was transferred to Beaumont ER in royal oak via ambulance**. Pt left the clinic in stable condition.

(Ex. 12 of 7/5/23 Administrative Appeal). (emphasis added).

41) Ms. Jackson-Smith presented to Beaumont's Emergency Department on 1/24/23 via ambulance due to chest pain and was hospitalized through 1/25/23:

**Impression**
**Non cardiac chest pain**
- Ischemic work-up did not reveal acute ischemia on this admission

- Chest pain was easily provoked on palpation, most likely musculoskeletal.

- Pain on palpation in the epigastric area. Gastritis, dyspepsia, PUD are on differential. On PPI now. Management per primary.

**History of paroxysmal A. Fib**
- Likely secondary to her intraventricular hemorrhage in 2020.

- CHA2DS2-VASc score is 4, however, she was not started on any anticoagulant in 2020 due to her interventricular hemorrhage.

- The patient is not on any rate or rate control medications at home.

- TMS monitoring.

- Consider Holter monitoring outpatient.

**Hypertension**
- Continue on losartan 50 mg daily.

25

- Monitor blood pressure and adjust his regimen if necessary.

- Consider adding amlodipine if blood pressure is not well controlled on the current regiment.

**Migraines**
- Continue on amitriptyline 10 mg every night at bedtime, divalproex 500 mg twice daily, gabapentin 600 mg every night at bedtime.

**Left vertebral artery pseudoaneurysm status post coiling in 2011.**

**Small intracranial hemorrhage in 2020.**

**History of transitory ischemic attacks in 2011, 2013**
- The patient was started on atorvastatin 20 mg daily.

**Fibromuscular dysplasia**
The patient is stable from the cardiac standpoint, therefore, we are signing off. We were happy to take care of this patient. If you have any questions or concerns, please don't hesitate to call us or place or consult. Thank you!

**IMPRESSION/MEDICAL DECISION-MAKING:**
Ms. Jackson Smith is a 56 y.o. right handed female with history of anemia, fibromuscular dysplasia with left vertebral artery dissection and subsequent pseudoaneurysm s/p coiling (04/2011 and 03/2013), HTN, Sjogren's disease, chronic migraine headaches, IVH in 08/2020, recently diagnosed fibromyalgia who presented to the WBUH EC on 01/24/2023 for evaluation of dizziness and chest pain.

HCT personally reviewed; no acute intracranial abnormality.

Low suspicion for a primary CNS etiology of dizziness. CTA head/neck ordered.  Reasonable to obtain as an outpatient as patient gets CTA head/neck annually for surveillance. Cardiology following. Plan is for cardiac monitor as an outpatient. Fibromyalgia could be contributing to chest discomfort. Will increase Amitriptyline to 25 mg po QHS.

**RECOMMENDATIONS:**
1. HCT negative for an acute intracranial abnormality
2. Follow up CTA head/neck as an outpatient
3. Continue Depakote 500 mg po bid for HA prophylaxis
4. Fioricet prn.  Nurtec prn.
5. Increased Amitriptyline from 10 mg to 25 mg po QHS
6. Cardiology following
7. Further cardiac monitoring
8. Continue Gabapentin 600 mg po QHS

(Ex. 6 of 7/5/23 Administrative Appeal).

42)    Ms. Jackson-Smith had lab work performed on 2/20/23. **(**Ex. 7 of 7/5/23 Administrative Appeal).

43)    Ms. Jackson-Smith treated with Ahmed K. Ghamraoui, D.O. (vascular surgeon) on 3/2/23 to evaluate a left upper extremity arterial aneurysm and lower extremity aneurysm:

Ms. Jackson Smith is a pleasant 56y.o. female, referred for further evaluation of left arm vascular mass.  Patient

27

states that she first started noticing the mass at her left antecubital fossa several years ago and has been progressively getting larger since that time. **She has a history of multiple intracerebral aneurysms and a family history significant for aneurysmal disease with multiple relatives dying from ruptured aneurysms in their 40s**. She was previously diagnosed with FMD, Sjogren's, and fibromyalgia, but denies any frank pain at rest to the left arm mass.  She has had multiple intracranial coiling and stents. She has significant anxiety regarding the mass given her previous history of ruptured intracranial aneurysms and significant family history for ruptured aneurysms. She does additionally complain of rest pain in her legs along with generalized aches and pains throughout her body. Patient has no further complaints or concerns at this time . . .

Vascular: 2+ femoral, popliteal, radial, brachial pulses bilaterally, diminished DP and PT pulses b/l, widened popliteal pulses b/l; L antecubital fossa with mass, faintly pulsatile.

**Diagnostic Studies:**
**Ultrasound left forearm, 1/17/2023** 8:32 AM.
Scanning was performed in the location of the palpable mass as indicated by the patient, in the left forearm.

Within the anterior distal left forearm there is a small hypoechoic lesion in the subcutaneous tissue measuring 1.3 x 1.0 x 0.2 cm likely representative of a lipoma.

Within the antecubital fossa there is focal saccular dilatation of a vascular structure likely relating to an antecubital vein measuring 1.3 x 0.9 x 0.6 cm with focal absence of flow on color Doppler. Findings **are concerning for thrombosed vein**. There is some vascular flow identified around the filling defect.

28

Impression:

1. The palpable lump in the antecubital fossa correlates with a partially thrombosed venous aneurysm/pseudoaneurysm. Recommend correlation with prior trauma and follow-up as clinically indicated.

2. Palpable lump along the anterior distal forearm correlates with a 1.3 cm lipoma.

Assessment and Plan:
Upper extremity ultrasound images independently reviewed, shows saccular vascular mass at antecubital fossa with partial thrombosis with to-and-fro flow in the non-thrombosed area consistent with pseudoaneurysm. The pseudoaneurysm is enlarging and causing the patient significant anxiety and discomfort and as such, would recommend excision and repair of left arm pseudoaneurysm.

(Ex. 9 of 7/5/23 Administrative Appeal). (emphasis added).

44) On 3/10/23, Ms. Jackson-Smith treated with Dr. Grysiewicz (neurology) whose diagnoses included:

Chief complaint: Evaluation Visit diagnoses:

• Fibromuscular dysplasia

• Intractable migraine without aura and without status migrainosus

• Primary hypertension

• Numbness and tingling

29

- Vertebral artery dissection

- Anxiety

IMPRESSION/MEDICAL DECISION-MAKING:
Ms. Jackson Smith is a 56y.o. right handed female with history of anemia, fibromuscular dysplasia and left vertebral artery dissection with subsequent pseudoaneurysm s/p coiling (04/2011 and 03/2013), HTN, Sjogren's disease, chronic migraine headaches and IVH in 08/2020 who is presenting for follow up.

Regarding IVH, she initially presented to the EC on 08/08/2020 with severe nausea, dizziness and gait instability.  New onset atrial fibrillation in the EC. Neuroimaging personally reviewed; HCT without contrast consistent with intraventricular hemorrhage in the 4th ventricle. CTA shows progression of right vertebral artery stenosis/occlusion with stable left vertebral artery stent/coiling.  MRI/MRA brain negative for an acute intracranial abnormality other than the intraventricular hemorrhage; intracranial vasculature does not appear significantly different compared to the MRA from 10/2018.  Cerebral angiography completed on 08/11/2020; pseudoaneurysm is stable.  No source of hemorrhage identified.  Following at Cleveland Clinic for FMD as well.  Follow up HCT from 10/30/2020 personally reviewed, resolution of 4th ventricular hemorrhage.  No acute hemorrhage or other acute findings.

She continues to have intermittent symptoms of vertigo, weakness and numbness.   MRI/MRA brain from 02/2021 personally reviewed; no acute intracranial abnormalities. Stable IVH.  There are **stable abnormalities of the vertebral arteries as outlined above**.  MRI cervical spine from 02/2021 personally

30

reviewed; interval degenerative changes at C4-5 and C5-6 with mild central canal stenosis and bilateral neural foraminal narrowing.  Discussed that the cervical radiculopathy is the likely etiology of her intermittent RUE paresthesias.  Follow up CTAs in 03/2022 personally reviewed, stable.

RECOMMENDATIONS:
1.      Continue Depakote 500 mg po bid for HA prophylaxis.  Tylenol  prn.

2.      Okay to use Fioricet prn.  Benefited in the hospital historically; however, discussed the potential risk of rebound HA and that medication should [not?] be used more than 3 times per week.

3.      Maintain normotensive blood pressure with goal < 140/90, but avoid  hypotension. Recommend avoiding hydralazine due to risk of precipitous drops in blood pressure.  Patient was on propranolol for HA prophylaxis and HTN, but continued to have bradycardia.  Developed a cough when transitioned to Lisinopril.  Follow up with cardiology.

4.      Zofran and meclizine prn.

5.      Continue HEP.

6.      Continue Xanax 0.5 mg for anxiety.

7.      Follow up CTA head/neck to evaluate for interval dissection/pseudoaneurysm.

8.      EMG/NCS of the LEs to evaluate for radiculopathy and/or neuropathy.

31

9.    MRI heart scheduled.

10.    Arterial duplex of the exts ordered.  Following with vascular surgery.

11.    Increased Amitriptyline to 75 mg po QHS for HA prophylaxis.

12.    May need updated disability forms completed.  As outlined in previous documentation, patient is unable to perform her previous job at the casino due to the multiple medical issues outlined above.

13.    Follow up in the neurology clinic in 3 months.

(Ex. 10 of 7/5/23 Administrative Appeal).

45)    A   3/13/23   heart   MRI,   with   and   without   contrast, demonstrated:

Impression:
1.    The LV is normal in size with normal systolic function. The calculated LVEF is 58%.

2.    There is no evidence of late gadolinium enhancement to suggest scar or fibrosis.

3.    The T1 and T2 mapping times are normal suggesting lack of myocardial infiltration and edema.

4.    The right ventricle is normal in size with normal systolic function.  The calculated RVEF is 55%.

32

5.      There are no Task Force Criteria present for the
        MRI assisted diagnosis of ARVD/C. There is normal
        RV size and function without evidence of
        microaneurysms or delayed enhancement of the
        free wall.

6.      No significant cardiac valvular abnormalities.

7.      Pulmonary to systemic flow ratio, QP/QS equals
        0.96; normal. No evidence of shunt.

8.      No pericardial effusion.

(Ex. 7 of 7/5/23 Administrative Appeal).

46)     On 3/23/23, Ms. Jackson-Smith treated with Dr. Cami, who reviewed Mobile Cardiac Telemetry for the period 2/13/23 through 3/14/23, which indicated: "'The patient's monitoring period was 02/13/2023 - 03/14/2023.  Baseline sample showed Sinus Rhythm w/PVCs (1 in 1min) with a heart rate of 71.7 bpm.  There were 0 critical, 0 serious, and 24 stable events that occurred. The report analysis of the critical, serious, stable and manually triggered events are listed below.'" (Ex. 7 of 7/5/23 Administrative Appeal).

47)     On 3/24/23, Dr. Ghamraoui performed an excision and repair of left upper extremity aneurysm to prevent rupture and relieve symptoms. (Ex. 9 of 7/5/23 Administrative Appeal).

33

48)     On  3/26/23,  Ms.  Jackson-Smith  presented  to  Beaumont's

Emergency Department due to the following complaints:

> Patient with history of vascular aneurysms status post cerebral aneurysm coiling, prior hemorrhagic CVAs, **left arm AC aneurysm repair 3 days ago presents today** with concern for 3 days of headache similar to prior headaches when she had intracranial hemorrhage and left-sided chest pain.  She does not associate chest pain with activity or exertion, denies any associated shortness of breath or palpitations, lightheadedness, vision change, weakness, paresthesia, cough, fevers chills, nausea vomiting diarrhea.  She has not taken analgesic PTA . . .
>
> ED Course: Patient received Tylenol, Dilaudid, Zofran, fluid bolus, Ativan, tolerated exam well, improved upon reevaluation.  No focal neurodeficits.  Troponin 0.01x2.  EKG showing sinus rhythm with nonspecific T wave change.
>
> Chest x-ray unremarkable.  Lett upper chest reproducible likely MSK.  CTA head and neck ordered and pending.  Case signed out pending imaging with likely plan for discharge for outpatient follow-up.
>
> **Disposition**:
> Stable, likely discharge pending CTA head and neck
>
> **Final Impression:**
> 1.  Headache 2. Atypical chest pain

(Ex. 6 of 7/5/23 Administrative Appeal). (emphasis added).

34

49)     On 3/29/23, Ms. Jackson-Smith treated with Lori K. Weide, M.D. (primary care) for a follow-up exam:

> Pt is here for follow up from the ER. She has history of venous aneursyms and had repair of one in her arm fairly recently and then presented to ER with complaints of chest pain. She had been experiencing headaches and feeling like she was going to pass out.  In February and went to urgent care and then they transferred her to the hospital. She was found to have some blockage in her heart blood vessels and she was started on lipitor and following up with cardio. She will be seeing him soon. She also lung doctor appt today.  She had been put on lisinopril that gave her a cough and during work up of her cough they had a test that showed possibly enlarged heart. She has a history of sjorgrens disease and thinks this is giving her more issues. She has seen a rheumatologist but due to follow up but has been so busy with her other issues. She is under a lot of stress with her disability papers.  She has not been able to work due to her multiple medical issues and this is causing her a lot of emotional stress and financial stress.   She did have some episodes of numbness in her toes off and on. She will be having ultrasound of her legs to check for any aneurysms in her legs.
> She does have an order from cardio to have her lipids checked.
> Her blood pressure was elevated in the hospital and then yesterday at home.
>
> Assessment/Plan
> Tanya was seen today for er f/u.
>
> Diagnoses and all orders for this visit:
> Generalized anxiety disorder

- diazePAM (Valium) 5 MG PO Tab; take 1 Tablet by mouth every 8 hours as needed for FOR ANXIETY.

History of ongoing treatment with high-risk medication
- Drugs of Abuse without Confirmation, Urine; Future Anxiety

Sjogren's syndrome without extraglandular involvement (CMS/HCC)

Hypertension, unspecified type

Venous aneurysm

Other orders
- losartan (COZAAR) 100 MG PO Tab; take 1 Tablet by mouth once daily.

- sertraline (ZOLOFT) 50 MG PO Tab; take 1 Tablet by mouth once daily.

she will increase the cozaar to 100 mg and will also start on zoloft and refill the
valium. She will continue to follow her specialists and will follow up here in 6-8 weeks.

(Ex. 11 of 7/5/23 Administrative Appeal).

50) On 4/5/23, Ms. Jackson-Smith presented to Beaumont Urgent

Care, West Bloomfield complaining of a bladder infection:

Tanya Marie Jackson Smith is a 56y.o. female patient presents to the clinic with dysuria, frequency, hematuria, flank pain, and lower abdominal pressure since yesterday. Pt denies fever, chills, vaginal pain, vaginal

> discharge, N/V/D, fatigue, or weakness. Pt has not taken anything to relief [sic] her symptoms.
>
> UA positive for leukocytes, protein, and blood. The pt treated for UTI with Bactrim.  Urine culture pending. Will call pt if treatment adjustment is necessary based on urine culture results. Pyridium was prescribed for symptoms relief. Advised pt to take medications as directed, take as needed, increase fluids intake. Follow up with PCP in 3-5 days for reevaluation. Go to ER if worsen.

(Ex. 12 of 7/5/23 Administrative Appeal).

51)    On 4/11/23, Ms. Jackson-Smith treated with Dr. Ghamraoui for a post-operative appointment:

> Ms. Jackson Smith is a pleasant 56y.o. female, presents for post-op follow-up after resection of LUE aneurysm on 3/24/23 and to review duplex ultrasound results of her lower extremities.
>
> She was initially referred for further evaluation of left arm vascular mass. Patient states that she first started noticing the mass at her left antecubital fossa several years ago and has been progressively getting larger since that time. She has a history of multiple intracerebral aneurysms and a family history significant for aneurysmal disease with multiple relatives dying from ruptured aneurysms in their 40s. She was previously diagnosed with FMD, Sjogren's, and fibromyalgia. She has had multiple intracranial coiling and stents. She has significant anxiety regarding the mass given her previous history of ruptured intracranial aneurysms and significant family history for ruptured aneurysms. She does additionally complain of rest pain in her legs along

37

> with generalized aches and pains throughout her body. Patient has no further complaints or concerns at this time . . .
>
> Patient recovering well from surgery, c/o mild stiffness near the incision site but denies any continued pain. Distal pulses remain intact. Pathology reviewed with patient, shows expected aneurysm without other abnormality. Continue with lifting restrictions of no more than 10 lbs in left upper extremity until 4 weeks post-op.
>
> Lower extremity arterial duplex ultrasound independently reviewed and results discussed with patient, **shows bilateral aneurysmal changes of the popliteal arteries at 1 cm on the right and 1.2 cm on the left**. I had a long conversation with the patient regarding the pathophysiology and natural history of popliteal aneurysms. Patient with ABIs within normal limits without aneurysm thrombus or distal disease and aneurysm does not meet the size threshold for repair of 2 cm in an asymptomatic patient. **Recommend continued monitoring in 6 months. Will also perform an aortic duplex ultrasound at that time to evaluate for abdominal aortic aneurysm due to high risk of co-occurrence with popliteal aneurysms and significant family history for abdominal aortic aneurysm**.

(Ex. 9 of 7/5/23 Administrative Appeal). (emphasis added).

52)   Ms. Jackson-Smith returned to Dr. Ghamraoui on 4/25/23 complaining of bilateral foot numbness as follows:

> Ms. Jackson Smith is a pleasant 56y.o. female, presents for follow-up. She states that over the weekend starting

> Saturday, 4/22 she began experiencing numbness to the feet bilaterally at the lateral aspect following by left leg pain radiating down from her hip to her foot, worse at the left knee, worse with movement and ambulation, better with rest. She has a history of multiple intracerebral aneurysms and a family history significant for aneurysmal disease with multiple relatives dying from ruptured aneurysms in their 40s. She was previously diagnosed with FMD, Sjogren's, and fibromyalgia. She has had multiple intracranial coiling and stents.   She has significant anxiety regarding the mass given her previous history of ruptured intracranial aneurysms and significant family history for ruptured aneurysms. She does additionally complain of rest pain in her legs along with generalized aches and pains throughout her body. Patient has no further complaints or concerns at this time . . .
>
> Patient presenting with acute left leg pain and bilateral foot numbness. She has readily palpable dorsalis pedis pulses, sensation intact first interweb space bilaterally. Acute symptoms not likely due to thromboembolism from popliteal aneurysms, more likely nerve pain/sciatica. Recommend follow-up with her neurologist for evaluate of any lumbar spinal disease that may be contributing to these acute symptoms.

(Ex. 9 of 7/5/23 Administrative Appeal).

53)   On 5/5/23, Ms. Jackson-Smith spoke with Jennifer G who works with Dr. Grysiewicz and indicated that "Dr. Grysiewicz still intends to complete her disability paperwork.  As soon as it is done, we will reach out

to her to find out where to send it. Patient was very appreciative of the information." (Ex. 10 of 7/5/23 Administrative Appeal).

54)    On 5/10 and 5/17/23, Ms. Jackson-Smith spoke with George C and Jennifer G, respectively, regarding a requested report supporting disability:

> [George C] Writer called and spoke to Patient on phone regarding her letter request from the provider. The provider informed me her plan is to address next Monday, 05/15/2023.
>
> [Jennifer G] Spoke with patient who is again inquiring about her "paperwork."  Writer informed the patient that we are not completing paperwork for her but that Dr. Grysiewicz is composing a letter summarizing nine years of complex medical care for her. I explained that Dr. Grysiewicz is aware of the need for this information and that I will call her as soon as it is completed. She thanked me for the information.

(Ex. 10 of 7/5/23 Administrative Appeal).

55)    Ms. Jackson-Smith followed up with Dr. Weide on 6/29/23 as follows:

> There are reports from her specialists in her chart but with her multiple medical issues, **she is not able to work at this time and the prognosis does not anticipate these issues Improving to the point where she could work any job**.

40

She needs to avoid stressful situations and needs to be able to lie down and rest to help with her symptoms. She is not able to stand for long periods of time due to her legs having pain from the aneurysms. She has trouble concentrating because of the constant headaches. The anxiety also contributes to the inability to concentrate. Her continued pain and discomfort go up and down in intensity, but there is always some type of pain and she cannot be working in a situation where she needs to be depended on regularly.

This is very frustrating for the patient as she would like to work if she could, but her physical and medical restraints prevent her from doing so at any occupation and she should be permanently disabled as already determined by social security and her specialists.

She has her granddaughter stay with her and she does not go anywhere by herself due to her recurrent dizzy spells. She does not do housework or shopping. Sometimes she needs help getting out of the bed. When asked what she does all   day she says her grandchildren come to visit her some and she watches a lot of tv and rests and goes to a lot of doctor appointments. She is still being evaluated to find treatment options to help prevent further complications and progression of her diseases and symptoms.

(Ex. 11 of 7/5/23 Administrative Appeal). (emphasis added).

56)    The Hartford sent Ms. Jackson-Smith's records to Santoshi Bilakota, M.D. (neurology) for a records review.  On 8/15/23, Dr. Bilakota offered the following conclusions:

41

This is a 57-yaar-olcl female with a history of intracerebral hemorrhage, intraventricular atrial Fibrillation, Sjogren's disease, chronic pulmonary disease, asthma, hypertension, chronic migraines, upper and lower extremities weakness and instability, vertebral artery aneurysm, fibromuscular dysplasia, and dissection status post colling.

She became eligible for Long-Term Disability (LTD) starting from 2/6/2021. Her LTD benefits were granted and continued from 2/6/2021 to 2/5/2023.  However, effective 2/6/203, the LTD benefits were denied due to non-compliance.  The claimant was informed about modifications in testing for various occupational capacities and the necessity for supplementary medical data.  Despite reviewing the limited provided information, it was insufficient to gauge functional Impairment.  As a result, the claimant was referred for an Independent Medical Examination (IME).  **She postponed and eventually skipped the IME, mentioning alterations in her functional status as the reason for her absence** . . .

Dr. Rebecca Grysiewicz, Neurology Phone:248-551-1550 I called on 8/8/2023 at 9:44 am; left voice mail (LVM) with Kristina requesting return call from AP Grysiewicz.

I called on 8/9/2023 at 10:45 am; LVM with Kristina requesting return call from AP Grysiewicz . . .

### MEDICAL ANALYSIS

Aneurysms arising from dissections related to fibromuscular dysplasia represent a complex vascular condition. Fibromuscular dysplasia involves abnormal growth within arterial walls, which can lead to  weakening and subsequent aneurysm formation.  In cases where vertebral artery aneurysms are detected,

42

medical intervention often involves endovascular coiling to mitigate the risk of rupture. A potential complication that can arise is intraventricular hemorrhage, where bleeding occurs into the brain's cavities and necessitates diligent monitoring and appropriate medical management to minimize its impact on the patient's neurological well-being.

Of note, there is no provided documentation in the notes suggesting the extent of this complication and symptoms secondary to it.

**Would claimant be able to sit for 8 hour day, 5 days a week in a consistent basis?**
> The claimant demonstrates the ability to consistently engage in 8-hour seated activities on a regular 5-day work schedule.

**Is there any evidence of cognitive deficits including memory, focus amt concentration?**
> Notably, there is no discernible evidence pointing towards cognitive deficits encompassing Memory, focus, or concentration.

**What effect if any do the conditions, as a whole or in part, have on the overall functional capacity/**
> The medical documentation does not provide evidence suggesting that the collective or individual impact of her conditions influenced her broader functional capacity.

(Claim File).

57) Contrary to Dr. Bilakota's characterization, Ms. Jackson-Smith

did not "postpone or skip" any IME. She could not attend the 1/24/23 IME

43

with Dr. Emmer because she was hospitalized at Beaumont Health (Corewell) on that date, of which fact The Hartford was aware and ultimately closed the referral, i.e., it did not desire any further IMEs.

58)     Although Dr. Bilakota listed Dr. Weide's 6/29/23 records as one she had reviewed, Dr. Bilakota failed to address the substance of Dr. Weide's opinions supporting Ms. Jackson-Smith's total and permanent disability.

59)     The Hartford does not appear to have advised Dr. Bilakota that the Social Security Administration had determined that Ms. Jackson-Smith became disabled under its rules on 10/21/19 and has been paying monthly benefits since 4/1/20 without issue.

60)     The Hartford also sent Ms. Jackson-Smith's records to Daniel Opris, D.O. (internal medicine) to review.  In relevant part, Dr. Opris opined as follows:

> **ATTENDING PHYSICIAN TELECONFERENCE**
> **N/A**
>
> **CO-REVIWER PHYSICIAN TELECONFERENCE**
> A conversation was had with my Co-Reviewer, Dr. Santoshi Bilakota (Neurology) on 8/15/2023 at 3·00 pm EST.
>
> Following a thorough review of the documentation provided, we discussed our opinions from our own specialty's perspective.  We reached accordance and agreement

44

regarding the case and our separate opinions.  Those opinions are detailed further in our respective reports.

We opined that for the medical conditions listed to review, there was insufficient evidence to support any significant degree of functional impairment from a neurologic or physiologic perspective for the time period in question 2/6/2023 through 8/30/2023 . . .

### MEDICAL ANALYSIS

This review will focus on the claimant's history of hypertension, chronic pulmonary disease, paroxysmal atrial fibrillation, Sjogren's disease, and migraines . . .

Based on the documentation provided and following consultation with my Co-Reviewer, Dr. Bilakota, there is insufficient evidence from a physiologic perspective to support a significant degree of functional impairment for the aforementioned clinical diagnoses for the time period in question of 2/6/2023 through 8/30/2023.

No significant functional impairment is supported by the provided documentation for the aforementioned clinical diagnoses.  Therefore, no limitations am supported to suggest the claimant would be incapable of sitting for 8 hours a day, 5 days a week on a consistent basis for the aforementioned time period in question.

The aforementioned diagnoses are chronic in nature, and as there is insufficient data to support their contribution toward any significant functional limitations prior to or during the time period in question (2/6/2023 through 8/30/2023), it Is my opinion that the claimant's prognosis remains favorable with respect to the diagnoses in question.

(Claim File).

61) The Hartford does not appear to have advised Dr. Opris that the Social Security Administration determined Ms. Jackson-Smith became disabled under its rules on 10/21/19 and it had been paying monthly benefits since 4/1/20 without issue.

62) On 8/18/23, The Hartford provided Ms. Jackson-Smith with copies of Drs. Bilakota and Opris' reports and allowed her the opportunity to respond.

63) On 9/6/23, Ms. Jackson-Smith emailed The Hartford Dr. Grysiewicz's treatment note in which she opined:

> Continue to have migraine headaches regularly. Headaches do not occur everyday, but present the majority of days. She can have a headache multiple days in a row. She has been out of Fioricet, which does help her headaches. Tried Nurtec but discontinued because It did not agree with her. Continues to have intermittent episodes of vertigo.
>
> She was seen In the EC in 03/2023 for chest pain and headache. Follow up CTA head/neck completed at that time was negative for interval changes.
>
> Chest pain improved. MRI of the heart was unrevealing.
>
> Continues to have has paresthesia of both feet. The last 3 toes bilaterally are going numb and she is getting charlie horses regularly. LE arterial duplex revealed ectasia of the bilateral popliteal arteries.

46

Following with vascular surgery. History of chronic low back pain, but no Increase of pain at this time.

She underwent aneurysm repair in her left arm on 03/24/2023.

Endorses worsening memory loss. Notices during conversations and she is forgetting names.

Disability has not resumed and she has working with a lawyer. Reports increased stress regarding the financial situation . . .

B/P: 143/98

**Neurologic Exam:**
Motor: *Subtle* Right pronator drift and mild grip weakness +4/5. Right knee flexors -4/5. Mild hip flexor Weakness bilaterally. Otherwise, 5/5 strength. Normal tone.

Gait: Normal base. Gait is slow, intermittent drag of the right leg. Tandem not fully tested due to instability with attempt . . .

**Recommendations:**
14. As outlined in previous documentation, patient is unable to perform her previous job the casino indefinitely due to multiple medical issues outlined above including, but not limited to: fibromuscular dysplasia with **high risk for aneurysm/pseudoaneurysm** with rupture/ intracranial hemorrhage (IVH in 08/2020 while she was working in this position), chronic migraine headaches, Sjogren's disease, recurrent chest pain, paresthesia/numbness, weakness and anemia with associated fatigue. **PATIENT IS**

47

**DISABLED FROM ANY FULL TIME EMPLOYMENT
DUE TO THESE CHRONIC CONDITIONS**.

(Claim File). (emphasis added).

64)     Ms. Jackson-Smith also provided The Hartford with her 9/1/23

EMG:

> Impression: NORMAL STUDY:
> 1.     There is no electrophysiological evidence of a
>        polyneuropathy.
>
> 2.     As additional needle EMG was not performed at the
>        patient's request; no statement may be
>        rendered regarding the diagnosis of a lumbosacral
>        radiculopathy on either side.

(Claim File).

65)     On 9/28/23, The Hartford denied Ms. Jackson-Smith's appeal:

> We completed our review of Tanya Smith's appeal for
> the Long-Term Disability (LTD) claim (#27751877)
> benefit. We agreed with the original decision to deny the
> benefit as of 2/6/2023.
>
> Please refer to the 2/6/2023 letter that listed the
> evidence from the claim file, as well as the applicable
> Policy provisions and guidelines, which were relied upon
> to make that determination.  That decision was based
> upon a complete review of the information in the claim
> file and communicated that you did not attend an IME
> and your records did not support disability for any
> occupation, as outlined by the Policy.

48

On 8/17/2023 and 8/18/2023 we shared copies of the Peer Reviews with you. **You were allowed time through 8/28/2023 to review the information and decide if you wanted to provide a response and/or any additional Information. As of today we have not received a response or any additional information from you**.

Based on the findings of the Peer Reviews, The Hartford determined that your client's medical conditions did not rise to the level of severity that would require any restrictions or Imitations in her ability to function.

(Claim File). (emphasis added).

66)     On 8/21/23, and in response to Ms. Jackson-Smith's request for additional time to respond to Drs. Bilikota and Opris' opinions, The Hartford conveyed the following:

We're in the process of reviewing your client's appeal, but you've requested additional time. We received your voice mail message you left on 8/21/2023 requesting additional time to submit additional medical information in support of your client's appeal review.

You and The Hartford have agreed that you will have until 9/21/2023 to submit additional information that you want us to review and that The Hartford will continue its review after that time. Please send us the information by 9/21/2023. If we don't get the information by then, we'll continue our review and you can expect a decision by 11/4/2023, unless we need more time due to special circumstances.

(Claim File).

49

67) Despite emailing The Hartford on 9/6/23 Dr. Grysiewicz's 7/26/23 treatment note and the above-described 9/1/23, EMG, The Hartford, according to its 9/28/23 appeal denial, did not review that information, including Dr. Grysiewicz's well-supported medical opinions and opinion supporting total and permanent disability.

68) The Hartford's actions have now foreclosed all avenues of administrative appeal and this matter is ripe for judicial review.

69) Valid, objective, and well-supported proofs establish that Ms. Jackson-Smith has been, and shall remain, totally and permanently disabled per the Plan's terms since The Hartford denied her claim effective 2/6/23 period.

**WHEREFORE**, based upon the preceding reasons, Plaintiff prays for the following relief:

A) That this Court enter judgment in Ms. Jackson-Smith's favor against The Hartford and order the immediate payment of disability income benefits retroactive to the date that benefits were wrongfully denied, approximately 2/5/23. If applicable, Ms. Jackson-Smith is also asking the Court to order The Hartford to honor her total disability waiver of life insurance premium.

B) That this Court order The Hartford to pay Ms. Jackson-Smith prejudgment interest pursuant to *Horn v. McQueen*, 353 F. Supp. 2d 785 (2004) and post-

judgment interest in accordance with M.C.L. § 600.6013 and 600.6455.

C)   That this Court award attorneys' fees pursuant to 29 U.S.C. § 1132(g).

D)   That Ms. Jackson-Smith be awarded any and all other types of relief to which she may be entitled, along with the costs of litigation.

Respectfully submitted:

**FELDHEIM & WILENKIN, P.C.**

By:   s/Ilana S. Wilenkin
Ilana S. Wilenkin (P61710)
Plaintiff's attorney
30300 Northwestern Highway, Suite 108
Farmington Hills, MI 48334-3255
(248) 932-3505; fax (248) 932-1734
ilana@lawsmf.com

Dated:  October 25, 2023